UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
MARTA MAHAN and JUAN RIVERA,        :
                                    :
                  Petitioners,      :
                                    :      MEMORANDUM AND ORDER
    - against -                     :
                                    :
                                    :      Civil Action No.
CITY OF NEW YORK, POLICE OFFICER    :      00-CV-6645
ALEXANDER BARTOLI, SUFFOLK COUNTY,  :
COMMISSIONER OF NEW YORK CITY POLICE :
DEPARTMENT, COMMISSIONER OF SUFFOLK :
COUNTY POLICE DEPARTMENT,           :
UNIDENTIFIED NEW YORK CITY POLICE   :
OFFICERS and CHRISTINE CUNNINGHAM,  :
TIMOTHY MORRIS, WILLIAM BLASCHUK,   :
WILLIAM REED and JOHN HOUGH,        :
                                    :
                  Respondents.      :
                                    :
------------------------------------X

TRAGER, J.

     Plaintiffs Marta Mahan ("Mahan") and Juan Rivera ("Rivera")

(collectively, "plaintiffs") bring this action against the City

of New York ("the City") and Police Officer Alexandor Bartoli

("Bartoli"), claiming civil rights violations under 42 U.S.C.

§ 1983 and violations of state tort law.  The City has moved for

summary judgment on both claims under Fed. R. Civ. P. 56(c).[1]

_____

     [1] Plaintiffs have also named as defendants Suffolk County,
the Commissioner of the Suffolk County Police Department, Police
Officers Christine Cunningham, Timothy Morris, William Blaschuk,
William Reed and John Hough (collectively the "Suffolk County
defendants").  The Suffolk County defendants have not filed any
motion to date.

## Background

### (1)

This case concerns an August 6, 1999 altercation between plaintiffs and Bartoli, which resulted in Mahan's arrest. During the time of the incident, Bartoli and Alzeena Short ("Short") (collectively, the "Bartolis")[2] were living in a house in Suffolk County, New York, owned by Mahan's mother, Joann Santiago ("Santiago").[3] At approximately 1:15 p.m., plaintiffs drove to the Bartolis' residence, purportedly to retrieve some personal belongings Mahan had left in the garage. See Marion Decl. Ex. A at 6-7. Rivera waited in the car while Mahan went to the front door. See Marion Decl. Ex. A at 13-14. Bartoli, at home at the time, was neither on duty nor wearing a uniform. See Defendant's Local Civil Rule 56.1 Statement of Undisputed Facts ("Def's 56.1") ¶¶ 1-3;[4] Declaration of Dara Weiss ("Weiss Decl.") Ex. E

_____

[2] Bartoli and Short were married as of August 6, 1999, see Marion Decl. Ex. B at 12-13, but are apparently separated. See Marion Decl. Ex. C at 7. In her deposition, Short refers to herself as "Bartoli" on some occasions and as "Short" on others.

[3] Santiago had previously agreed to rent the house to the Bartolis in exchange for regular mortgage payments. See Declaration of Amy Marion ("Marion Decl.") Ex. A at 7, 27 (Transcript of May 16, 2000 Deposition of Marta Mahan). See also Marion Decl. at Ex. B at 14-20 (Transcript of December 10, 2002 Deposition of Alexandor Bartoli); id. at Ex. C at 11-14 (Transcript of October 27, 2003 Deposition of Alzena Short).

[4] In accordance with Local Civil Rule 56.1, defendants have provided the court with a statement of undisputed facts. Plaintiffs, for their part, have not included any statement contesting the facts set forth in defendant's 56.1 Statement.

at 60 (Transcription of April 8, 2003 Deposition of Christopher Urquhart); Marion Decl. Ex. B at 45, 138.  A physical altercation ensued between Mahan and Bartoli, during which Bartoli identified himself as a New York police officer and attempted to place Mahan under arrest.  See Def's 56.1 ¶¶ 9-10; Marion Decl. Ex. B at 44, 50-53, 57-70.  The parties dispute many of the facts that led up to the arrest.[5]

During the altercation, Rivera exited the car, carrying a rectangular metal object measuring five inches in length, and approached Mahan and Bartoli.  See Def's 56.1 ¶ 13; Marion Decl. Ex. B at 77-80, 129-131.  Bartoli drew his service weapon, which was holstered at his side, and told Rivera to drop the object.  See Def's 56.1 ¶ 14; Marion Decl. Ex B at 78-79, 165.  Rivera, in

---

They have provided a document entitled "Specific Facts Showing That There Is A Genuine Issue For Trial," which will be construed as an opposition 56.1 Statement.

[5] With respect to the initial encounter, Mahan alleges that, when she came to the front door, Bartoli immediately punched her in the face, knocking her to the ground.  See Marion Decl. Ex. A at 10-12.  She further alleges that Bartoli continued to punch and kick her while she lay on the ground.  See Marion Decl. Ex. A at 13.  Bartoli, for his part, alleges that Mahan entered the house uninvited and began cursing, at which point he identified himself as a police officer, stating that he would arrest her if she did not leave the property.  See Def's 56.1 ¶¶ 6, 8; Marion Decl. Ex. B at 46, 50-51, 128-29.  When she did not leave, he attempted to arrest her by placing her against a wall.  See Def's 56.1 ¶ 10; Marion Decl. Ex. B at 57-59.  Bartoli claims that he read Mahan her Miranda rights at some point during the altercation.  See Marion Decl. Ex. B at 86.  Finally, according to Bartoli, the two fell out the front door onto the concrete.  See Def's 56.1 ¶ 9; Marion Decl. Ex. B at 60-61.

response, turned and fled down the street. See Def's 56.1 ¶ 15; Marion Decl. Ex. B at 79. In the meantime, Mahan ran to a neighbor's house and called 9-1-1. See Def's 56.1 ¶ 19; Marion Decl. Ex. A at 16-17. After Rivera ran away, Bartoli returned to his house and did the same. See Def's 56.1 ¶ 19; Marion Decl. Ex. B at 81.

When the Suffolk County police arrived, they took Mahan to the hospital for treatment of injuries she had sustained during the altercation. See Marion Decl. Ex. A at 18-20. Mahan described her injuries as a "split nose" and a condition in which her "teeth were all rattled out." See Marion Decl. Ex. A at 12. Hospital paperwork reflecting Mahan's treatment describes her injuries as a "bloody nose and loose front tooth." See Marion Decl. at Ex. E (Prehospital Care Report).

Mahan was eventually placed under arrest for criminal trespass and resisting arrest and was taken to the Suffolk County Third Precinct for processing. See Def's 56.1 ¶¶ 21,23; Marion Decl. Ex. A at 21-23, 25-26. The relevant Suffolk County police reports identify Bartoli as the arresting officer. See Marion Decl. Ex. J (Suffolk County Misdemeanor Information Docket # 33909-99); id. at Ex. K (Suffolk County Police Department Prisoner Activity Log); id. at Ex. L (Suffolk County Police Department Arrest Worksheet).

After the altercation, Bartoli reported the incident to his

command, and New York Police Department ("NYPD") personnel were dispatched to investigate the matter.  See Marion Decl. Ex. B at 98-100.  The resulting investigation concluded that Bartoli had been "fit for duty" and had "acted properly and within Department Guidelines in effecting the off-duty arrest."  Marion Decl. Ex. G (Brooklyn North Investigations Unit Memorandum).[6]

### (2)

Plaintiffs claim that the City is liable for violating their civil rights under 42 U.S.C. § 1983 by virtue of its failure to train, supervise or discipline Bartoli.  Plaintiffs also claim that the City is liable in tort under the state law doctrine of respondeat superior for the injuries caused by Bartoli.

A number of factual disagreements, which could impact plaintiffs' state-law claims, are apparent.  Specifically, the parties disagree on the extent of their prior relationship: plaintiffs allege virtually no prior relationship between the

_____

[6] The parties dispute whether Bartoli was in fact the arresting officer, a disagreement that could potentially have some bearing on plaintiff's state-law claims.  Plaintiff, pointing to the NYPD investigation, claims that Bartoli effected an off-duty arrest.  See Opposition of Motion for Summary Judgment ("Pl. Opp. Mem.") at 9.  The City, by contrast, alleges that Suffolk County police officers, not Bartoli, took Mahan into custody and filled out the arrest paperwork.  See Def's 56.1 ¶¶ 21, 24.  In support of its claim, the City cites the deposition testimony of Sergeant Morris, who stated that it was his decision to arrest Mahan and that any statements made by Officer Bartoli to police officers constituted mere assistance in another officer's decision to make the arrest.  See Def's 56.1 ¶¶ 22, 25; Weiss Decl. Ex. I 87-88 (Transcript of January 24, 2003 Deposition of Timothy Morris).

parties,[7] whereas Bartoli alleges at least some prior contact.[8] Because, as explained <u>infra</u>, plaintiffs' state-law claims will not be considered, it is unnecessary to pursue this issue in great detail.

## Discussion

To prevail on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Only disputes about material facts that might affect the outcome of the suit will properly preclude summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986). Where a motion for summary judgment is predicated upon the absence of proof of an essential element of a particular

---

[7] For instance, Mahan claims that she and "Bartoli had never had any contact with each other prior to the date of Mahan's arrest." Marion Decl. ¶ 1. Plaintiffs also claim that "Bartoli had never seen Mahan prior to the date of her arrest and he did not know anything about her." Marion Decl. ¶ 11.

[8] This includes at least one direct encounter between Short and Mahan where the latter expressed an interest in moving into the basement of the Bartolis' home. <u>See</u> Marion Decl. Ex. C at 14-17. Bartoli also suspects that Mahan was responsible for prior disturbances near the Bartolis' house. <u>See</u> Marion Decl. Ex. B at 32-36. Moreover, the Bartolis filed several complaints with the Suffolk County police regarding Mahan, at least one of which was filed before the altercation in question. <u>See</u> Def's 56.1 ¶ 26; Marion Decl. Ex. B at 30-37; <u>id.</u> at Ex. C at 17-20. <u>See also</u> Weiss Decl. Ex. J at 2 (Suffolk County Police Department Field Reports CC# 99-201970, 99-403311, 99-405384, and 99-411052).

claim for relief, the nonmoving party must produce evidence such that a rational trier of fact could find in its favor on that element.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Mere speculation and conjecture are not sufficient to defeat summary judgment.  See Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert den'd 480 U.S. 932 (1987).

## (1)

## 42 U.S.C. § 1983

In Monell v. Dep't of Social Services, 436 U.S. 658 (1978), the Supreme Court held that a municipal government may be held liable as a "person" under 42 U.S.C. § 1983 for the constitutional violations caused by its employees.  A plaintiff must demonstrate that "the violation of . . . constitutional rights resulted from a municipal custom or policy."  Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).

The Monell Court explicitly rejected respondeat superior liability for purposes of § 1983, and, consequently, "constitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights." Amnesty America v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004).  However, "[t]his does not mean that the plaintiff must show that the municipality had an explicitly stated rule or

7

regulation." <u>Vann</u>, 72 F.3d at 1049.  Rather, liability can attach either when an unofficial custom or practice becomes "so permanent and well settled as to constitute official municipal policy," <u>Monell</u>, 436 U.S. at 691 (citing <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 167-68 (1970) (internal quotation marks omitted)), or when "a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy." <u>Amnesty America</u>, 361 F.3d at 125.

After <u>Monell</u>, municipalities can be held liable in cases where they demonstrate a manifest failure to train, supervise or discipline their employees.  <u>See</u>, <u>e.g.</u>, <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985) (liability for inadequate training would require evidence of a "conscious choice . . . [of] a training program which would prove inadequate"); <u>Amnesty America</u>, 361 F.3d at 125 (city can be held liable where it is "aware that its policy may be unconstitutionally applied by inadequately trained employees but . . . consciously chooses not to train them"); <u>Vann</u>, 72 F.3d at 1049 (liability for failure to monitor employee can attach when "the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference"); <u>Fiacco v. City of Rensselaer</u>, 783 F.2d 319, 326 (2d Cir. 1986) (city can be liable for failure to supervise employees when deliberately indifferent to their use of excessive

8

force); Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir. 1980) (municipality may be held liable for failing to discipline subordinates when doing so demonstrates deliberate indifference to public safety). In such cases, "[o]nly where a failure ... reflects a deliberate or conscious choice by a municipality ... can a city be liable for such a failure under § 1983." City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989) (internal quotation marks omitted); see Amnesty America, 361 F.3d at 126 ("[T]he inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself.").

Plaintiffs' allegations, construed liberally, amount to allegations that the City was deliberately indifferent to its obligation to adequately train, supervise or discipline Bartoli, and possibly, by extension, other city employees, as well. First, plaintiffs note that, prior to the incident, the City placed Bartoli on a Force Monitoring List to assist him with rehabilitation, but failed to inform him of the decision, thereby undercutting the very purpose of the program. See Pl's Opp. Mem. at 4; Marion Decl. Ex. B at 112-117; id. at Ex. G. Plaintiffs allege that this failure undermines not only the rationale for the Force Monitoring List in the first place, but also NYPD policy. In support of this claim, they cite deposition testimony of Chief Thomas Lawless, who explained that the purpose of

notifying officers of their placement on the Force Monitoring

List is "to change the officer's conduct."  Marion Decl. Ex. I at

29 (Transcript of July 15, 2003 Deposition of Thomas Lawless).

According to Lawless, "you have to start with them – to let them

know that he or she may have a problem.  Sometimes they are

unaware of it."  Id.

According to Chief Lawless, the Force Monitoring List is a

graduated system of measures designed to reform the conduct of

potentially violent police officers.  See id.  An officer is

placed on a Force Monitoring List after a certain number of

complaints with the Civilian Complaint Review Board ("CCRB") have

been filed against a particular officer.  See id.  If accusations

of excessive force continue, sanctions such as termination of

employment may be imposed.  See id.  Plaintiffs claim that, in

light of this, the City could have, and should have, taken

additional steps to continue to monitor Bartoli and terminate his

employment if necessary.[9]

Plaintiffs point out that, as of March 27, 2003, thirteen

allegations of misconduct had been filed against Bartoli with the

Civilian Complaint Review Board ("CCRB"), six of which were

---

[9] See Pl. Mem. at 12 ("Additionally, individuals who are on
the Force Monitoring List should be referred to the Early
Intervention Unit, and/or should be the subject of quarterly
reports prepared by the precincts Integrity Control Officer,
and/or may be placed on dismissal Probation, where if they got
involved in another incident, they could be terminated.").

closed as "unsubstantiated."  See Marion Decl. Ex. N (CCRB
History for Officer Bartoli, recorded March 27, 2003).

Upon review of the parties submissions, it appears that only
six such grievances were filed, each of which contained more than
one allegation of wrongdoing, for a total of thirteen alleged
infractions.  See Marion Decl. Ex. N.  Bartoli's CCRB complaint
history is reproduced below:

| CCRB # (Incident Date) | Allegation | Disposition |
|---|---|---|
| CCRB # 9503710 (08/25/1995) | Abuse – Threat of Force | Unsubstantiated |
| | Force – Other – Force | Unsubstantiated |
| CCRB # 9504417 (10/13/1995) | Abuse – Person Searched | Unfounded |
| | Force – Push/Shove | Unfounded |
| CCRB # 9504449 (10/17/1995) | Abuse – Person Searched | Administratively Closed |
| | Force – Other – Force | Administratively Closed |
| CCRB # 9505108 (11/21/1995) | Force – Push/Shove | Unsubstantiated |
| | Force – Dragged/Pulled | Unsubstantiated |
| | Force – Push/Shove | Unsubstantiated |
| | Force – Dragged/Pulled | Unsubstantiated |
| CCRB # 9601977 (05/03/1996) | Force – Other – Force | Administratively Closed |
| | Discourtesy – Other – Discourtesy | Administratively Closed |
| CCRB # 9701998 (06/03/1996) | Force – Other – Force | Administratively Closed |

Each element of every complaint was resolved by the NYPD as either unsubstantiated, unfounded or administratively closed. Nevertheless, plaintiffs point out that the NYPD investigated one grievance in an untimely manner. The particular allegation, CCRB # 9503710, was filed on August 25, 1995 but apparently not investigated until April 22, 1997, at which point the statute of limitations had allegedly expired. See Marion Decl. Ex. P (Investigative Action document); id. at Ex. Q (Interview of Officer Bartoli). The City investigated the complaint but ultimately closed the inquiry as "unsubstantiated." See Marion Decl. Ex. N. However, according to plaintiffs, the statute of limitation had expired on this claim and, therefore, "the officer could no longer be disciplined if the complaint was substantiated." Pl. Mem. at 13-14. Plaintiffs argue that Bartoli was led to believe that he could persist in his violative conduct with impunity. Id. at 14.[10]

Plaintiffs' argument with respect to this particular complaint seems to be that the City, upon failing to timely process complaint # 9503710, summarily adjudged the complaint "unsubstantiated" in an effort to "cover up" its delay and

---

[10] Plaintiffs also note a recommendation by the Captain of the Internal Affairs Bureau that the incident between Bartoli and Mahan be classified in such a way as to lead to potential criminal charges against Bartoli. Eventually, Bartoli was cleared of any charges of misconduct for the incident. See Pl. Mem. at 15.

failure to investigate.  In addition, plaintiffs imply that other complaints against Bartoli that were similarly adjudged "unsubstantiated" were not thoroughly investigated either.

However, there is nothing in the record supporting this allegation.  Plaintiffs provide no evidence suggesting, directly or circumstantially, such a "cover up" or system-wide failure to investigate.

The parties' briefing and supplemental submissions do not provide the exact dates during which Bartoli was placed on the Force Monitoring List; neither do they detail whether Bartoli received any CCRB complaints while he was on the Force Monitoring List.[11]  However, based on plaintiffs' evidence, it seems unlikely that Bartoli was being monitored at the same time that any of the above-referenced complaints was filed with the NYPD, the most recent of which was filed more than three years before the incident in question.  In any event, plaintiffs do not pursue the point.

Insofar as a claim of failure to train is concerned, plaintiffs' allegation suffers from the fact that it involves, at most, one officer, as opposed to a deficiency in city-wide training programs.  There is no causal connection between the

---

[11]  It is apparent that Bartoli was on the Force Monitoring List at the time of the August 6, 1999 altercation that gave rise to this litigation.  See Marion Decl. Ex. G; see also Marion Decl. Ex. H (telephone log of August 6, 1999).

purported deficiency in training and the violations in question

or, for that matter, an inference of a deliberate or conscious

choice on the part of the municipality. In sum, "[p]laintiffs

here have proffered no evidence of the [City's] training programs

or advanced any theory as to how a training deficiency caused

[Bartoli] to use excessive force." <u>Amnesty America</u>, 361 F.3d at

130. Furthermore, "plaintiffs have provided no evidence tending

to rule out those causes of the excessive force that would not

support municipal liability, such as the negligent administration

of a valid program, or one or more officers' negligent or

intentional disregard of their training." <u>Id.</u>[12]

As far as a failure to discipline Bartoli is concerned,

plaintiffs run into the difficulty that the force monitoring

program, which they claim was improperly effectuated, is <u>itself</u>

evidence of disciplinary action against Bartoli. Although

plaintiffs point to testimony that the Force Monitoring List

requires that the officer placed in the program be so notified,

they do not cite any official regulation or statute setting forth

such a policy. With respect to CCRB complaint # 9503710, which

apparently went uninvestigated until after the expiration of the

---

[12] It goes without saying that these allegations fail to meet
the standard set forth in <u>Canton</u>, 489 U.S. at 390, that "the need
for more or different training [be] so obvious, and . . . so
likely to result in the violation of constitutional rights, that
the policymakers of the city can reasonably be said to have been
deliberately indifferent to the need."

limitations period, plaintiffs' assertion that the time lapse allowed Bartoli to escape unpunished is unreasonable, if not speculative. Actually, the City did indeed pursue the investigation, deciding, apparently, that disciplinary action was unwarranted. But even assuming, _arguendo_, that the complaint went completely uninvestigated, such a claim suggests, at most, one isolated incident of bureaucratic inaction – or perhaps negligent administration. However, "mere negligence or bureaucratic inaction" does not rise to the level of an actionable violation. See _Amnesty America_, 361 F.3d at 128. Plaintiffs must raise an inference that the municipality or its policy-makers actually condoned such conduct and that the system is "so deficient as to reflect a policy of deliberate indifference to the civil rights of the citizenry." See _Sarus v. Rotundo_, 831 F.2d 397, 401-02 (2d Cir. 1987). They have failed to do so, and, therefore, cannot proceed to trial on this issue.

Finally, plaintiffs allege that the City has failed to supervise or monitor Bartoli. As a general proposition, a plaintiff must allege more than a single incident of misconduct by a non-policy-making employee to support an inference of a municipal custom or policy under § 1983. See _generally_ _Tuttle_, 471 U.S. at 823-24 (reversing trial court jury instruction that single isolated incident of the use of excessive force by a police officer could establish a municipal custom or policy of

inadequate training). The <u>Tuttle</u> court made clear that it would be incorrect, "in the face of uncontradicted evidence that the municipality scrutinized each police applicant and met the highest training standards imaginable [t]o impose liability . . . simply because the municipality hired one 'bad apple.'" <u>Id.</u> at 821.

Nevertheless, in certain limited, particularly serious, egregious and abusive circumstances, courts have allowed claims to proceed to trial based on a failure to adequately investigate repeated complaints against one police officer. <u>See</u> <u>generally</u> <u>Vann</u>, 72 F.3d at 1050-51; <u>Davis v. Lynbrook Police Dep't</u>, 224 F.Supp. 463 (E.D.N.Y. 2002). However, the circumstances in this case come nowhere near the facts apparent in <u>Vann</u> and <u>Davis</u>.

In <u>Vann</u>, the Second Circuit reversed a district court order entering summary judgment for the City of New York despite allegations of an inadequate system of monitoring problem police officers. 72 F.3d at 1050-51. <u>Vann</u> involved the conduct of a single off-duty officer, Raul Morrison, who, upon reinstatement from restricted duty in 1988, assaulted the plaintiff. <u>Id.</u> at 1041-42. The court noted an extensive history of disciplinary and other remedial measures taken against Morrison prior to the 1988 incident, including numerous complaints – some of which were filed by fellow officers – as well as the need for ongoing psychiatric monitoring. <u>Id.</u> at 1042-45. The court noted a lack

of any real system by the City to effectively monitor problem officers. Id. at 1050. The plaintiff also provided expert testimony demonstrating that the City's failure to take notice of or act upon repeated complaints against problem officers after their reinstatement evidenced "a systemic failure which amounts . . . to callous indifference on the part of the [City]." Id. at 1047.

The Second Circuit agreed that the evidence demonstrated a paucity of "methods of dealing with problem policemen . . . after such officers were reinstated." Id. at 1050. The court credited the expert testimony as indicating that "the Department's supervisory units paid virtually no attention to the filing of new complaints against such officers even though such filings should have been red-flag warnings of possibly renewed and future misconduct." Id. With respect to Morrison in particular, the court noted an absence of any mechanism to monitor him despite numerous warning signs that problems might recur and the "foreseeab[ility] that Morrison would engage in misconduct yet again." Id. at 1051.

In Davis, a district court refused to enter summary judgment against a plaintiff alleging § 1983 violations for injuries caused by Lynbrook Detective James Curtis after the Town of Lynbrook failed to investigate several complaints against him. 224 F.Supp.2d at 479. The court noted that six complaints had been filed against Curtis with the Commanding Officer of the

Lynbrook Police Department ("LPD"), the Village of Lynbrook or the Chief of the LPD.  Id.  Moreover, at least two of the six complaints were filed by fellow police officers.  Id. at 470-72. The court also observed that, notwithstanding an oral admonition of Detective Curtis by a fellow officer, there was no evidence describing any investigatory steps or disciplinary actions taken by the LPD in connection with the complaints.  Id. at 479.

These cases are easily distinguishable.  In Vann, the sheer number of complaints against the officer at issue and the expert testimony regarding the monitoring system's programmatic deficiencies raised an inference of a system-wide deficiency in the monitoring of City police officers.  In the case at bar, plaintiffs' evidence of one allegedly inadequate investigation into one CCRB complaint against one officer does not support the kind of system-wide indictment present in Vann.  Additionally, Davis involved the complete failure to investigate complaints to senior police and municipal officials lodged by fellow police officers.  The case at bar, by contrast, does not allege anything close to a complete failure to investigate.  In fact, the evidence shows that the NYPD did investigate every allegation against Bartoli, although one investigation was delayed.  That lapse notwithstanding, there does not appear any of the type of "cover up" plaintiffs allege.  And such an assertion, without further evidence, lacks a sufficient basis in fact to warrant review by a jury.

In sum, plaintiffs have not met their burden at summary judgment to persist in their claim that the City failed to adequately train, supervise or discipline Bartoli.  Therefore, the City's motion for summary judgment is granted with respect to those claims.

**(2)**

**Respondeat Superior**

Having granted the City's motion for summary judgment on plaintiff's § 1983 claims, there remains the question whether the City should be liable for the altercation giving rise to this litigation under state law.  Plaintiffs claim that the City should be held liable under the doctrine of respondeat superior, while defendants argue that there can be no liability because the altercation was personal in nature.

Before reaching the merits of that claim, there is a preliminary question whether jurisdiction obtains in the wake of the dismissal of the federal-law claims.  Generally, if all federal claims have been dismissed before trial, the state claims should be dismissed as well.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  The supplemental jurisdiction statute, codified at 28 U.S.C. 1367, recognizes this principle by giving district courts discretion to "decline to exercise supplemental jurisdiction over a [supplemental] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "Needless

decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." Gibbs, 383 U.S. at 726.

The issue to be decided here – namely, whether the question concerning the City's liability for Bartoli's actions should be presented to a jury or, by contrast, precluded under exceptions in cases where officers act purely out of personal motivation – is a developing issue that courts have not resolved according to any bright-line rule. Indeed, the state courts seem increasingly divided as to what actions are clearly personally motivated for the purposes of summary judgment. Compare Davis v. City of New York, 226 A.D.2d 271, 272, 641 N.Y.S.2d 275, 276 (1st Dep't 1996) (finding "absolutely no basis upon which to conclude" that employee's actions were within scope of employment), and Stavitz v. City of New York, 98 A.D.2d 529, 531, 471 N.Y.S.2d 272, 274 (1st Dep't 1984) ("facts ... conclusively established that [defendant's] actions ... were taken for purely personal reasons, and not in furtherance of any duty owed to the City"), with Beauchamp v. City of New York, 3 A.D.3d 465, 466-67, 771 N.Y.S.2d 129, 131 (2d Dep't 2004) (issues of fact regarding personal motivation precluded summary judgment), and Campos v. New York, 195 Misc.2d 624, 625, 759 N.Y.S.2d 843, 844 (N.Y.Sup.Ct. 2003) (same). Because the New York courts are best equipped to consider this state-law claim, it is appropriate to decline

jurisdiction.  Consequently, the state-law claims are dismissed
without prejudice for further proceedings in state court.

## (3)

### Cross-Claims

Bartoli has filed a cross-claim against the City for
indemnification, but the claim is not being considered at this
time given that all federal-law claims against defendants are
dismissed and no state-law claims against defendants are being
considered.  Consequently, Bartoli's indemnification claim need
not be addressed at this time.


### Conclusion

For the foregoing reasons, the City's motion for summary
judgment is granted in part.  Plaintiffs' claim under 42 U.S.C.
§ 1983 is dismissed with prejudice.  Plaintiffs' state-law claims
against all defendants are dismissed without prejudice.  All
Bartoli's cross-claims are dismissed without prejudice.  The
Clerk of the Court is directed to close this case.


Dated:      Brooklyn, New York
            July_19, 2005

                          ORDERED:

                          _____/s/_____
                          David G. Trager
                          United States District Judge